### 72213. TOWERY et al. v. MASSEY.
(345 SE2d 90)

BANKE, Chief Judge.

The appellee, Robert Massey, sued the three appellants, M. A. Towery, Multi-Color Press, Inc., and One-Stop Graphics, Inc., to recover damages for fraud and breach of contract. The suit arose from a dispute between the parties involving their respective rights in connection with the termination of a lease pertaining to certain printing equipment. This appeal is from a judgment entered on a verdict in Massey's favor.

The equipment lease was executed on September 28, 1978, between appellant Multi-Color Press, Inc., as lessee, and C & S National Bank, as lessor. C & S was joined as a defendant below but obtained a favorable verdict and is not a party to this appeal. The lease called for Multi-Color to make 48 monthly rental payments to C & S in the amount of $756.48 each, following which Multi-Color was to have the option of purchasing the equipment for $1. Appellant Towery, acting as Multi-Color's president, signed the lease on the company's behalf and also personally guaranteed Multi-Color's obligation to make the lease payments.

In August of 1980, the appellee, Massey, added his personal guarantee to the lease and agreed to take over the monthly payments in return for Towery's oral promise to allow him to exercise the lessee's option of purchasing the equipment for $1 at the end of the lease term. Massey testified that Towery further agreed "that I could sell any of the equipment that I wanted to during the period of the lease, provided that the money was applied to the lease payments or the lease amount that the equipment was on the lease with C & S Bank. Any overage that would be sold for — I could keep that."

Towery's willingness to transfer to Massey what amounted to Multi-Color's equity of redemption in the equipment stemmed from the fact that he (Towery) had been experiencing financial difficulties and was two months behind in his payments on the lease. According to Massey, C & S National Bank, as lessor, agreed to waive these two payments until the end of the lease term in order to encourage him to add his personal guarantee to the obligation. Massey's willingness to assume the obligation apparently stemmed from his belief that he could sub-lease the equipment for more than the amount of the lease payments. However, this contemplated sublease never materialized, and it does not appear that Massey ever received any income from the equipment. Notwithstanding this, he continued to make the lease payments to C & S throughout the following year, although he was often late in doing so and apparently missed one payment altogether.

In September of 1981, C & S notified both Towery and Massey that because of the payment missed by Massey, as well as the two payments previously missed by Towery, it intended to accelerate the remaining lease payments and, if the accelerated balance were not paid in full by the end of the year, to repossess the equipment. On or about December 14, 1981, Towery tendered to the bank the full remaining balance due of $17,616.80 and received in return a bill of sale for the equipment. There was testimony at trial that the equipment was worth approximately $35,000 at this time.

Massey testified that in November of 1981, shortly before Towery's redemption of the property took place, Towery's nephew, Charles Murray, approached him (Massey) about the possibility of purchasing his "interest" in the equipment, with a view towards using the equipment to form a new printing business with Towery. Massey testified that he agreed to this request and further agreed to give Murray until January to come up with the money. Murray and Towery did in fact subsequently go into the printing business together, under the name One-Stop Graphics, Inc., using the equipment which had been the subject of the lease agreement.

Massey maintained that the reason he did not involve himself in Towery's redemption of the equipment from the bank was because of his understanding, as confirmed in subsequent conversations with

Towery, that Murray intended to pay for his (Massey's) interest in the property. After Towery obtained title to the equipment, however, both he and Murray took the position that they had no obligation to Massey whatever. Massey's fraud and breach of contract claims are based on the resulting defeat of his alleged rights with respect to the property.

Originally, the jury awarded Massey $12,103.68 as actual damages for breach of contract (this being the total amount of the lease payments Massey had made to C & S), plus $1 as punitive damages for fraud and $5,000 as attorney fees based on fraud. After examining the written verdict, the trial court asked the foreman if the jury had intended to award any actual damages for fraud, and the foreman responded that they had not. The following discussion then transpired:

"THE COURT: In view of the statements made by the foreman, let me ask first of all, do all the jurors agree with the statement made by the foreman in regard to the jury finding in favor of the defendants in regard to the fraud claim, that is, no amount of money will be awarded for actual damages for fraud? Is there any member of the jury who does not agree that is the jury's verdict? If so, raise your hand at this time.

"At this time the Court will, based upon the statement made by the jury, reform the verdict to reflect the intentions of the jury and that is the Court would delete the one dollar punitive damages and the $5,000 attorney's fees as being inappropriate, inasmuch as there is no finding as to actual damages for fraud in the case — as amended, not amended, but reformed by the Court, the Court accepts the verdict at this time.

"Counsel wish to come around and inspect this verdict?

"THE FOREMAN: Your Honor, may I address the Court?

"THE COURT: Yes, sir.

"THE FOREMAN: We are concerned citizens that want to participate as meaningfully and as intelligently as we can in the judicial process.

"We have sat through three days of lengthy and involved and complex testimony. We have listened to your charge this morning that ran for some 40 minutes, which you read in our presence. We have tried to make a decision as just as we knew how on the basis of that testimony and what we would, could remember of that complicated charge which you read.

"We did not understand that the failure to assess actual damages would prejudice our decision to render attorney's fees for the plaintiff. Had we known that, we would have done otherwise, I assure you. It is not our intention as a jury that these attorney's fees be [deleted] from the basis of the award to the plaintiff.

"We came here because we wanted to do the right thing and we

feel like that, well, quite frankly, I feel like that we have been — I am a little upset. Do you understand how we feel?

"THE COURT: Yes, sir. The Court did charge you as to when you could make an award of attorney's fees and when you could not. If the jury's finding is that there was not a finding of fraud in the case, then I am assuming that that verdict was based upon the evidence that you heard and that you found that there was not fraud in the case.

"THE FOREMAN: We did find fraud. We did.

"THE COURT: Well, I just asked if there were any actual damages as to fraud and you said no.

"THE FOREMAN: We did not understand that in order to find for fraud that we would have to assess actual damages. We saw there a blank that said fraud and three lines that would give us an option of making an award in each one. We made an award — we did not want to assess actual damages. If we had known that we had to assess actual damages, then we would have, in order for the plaintiff to recover attorney's fees.

"Now, how would we be expected to know that, Your Honor? We are not lawyers.

"THE COURT: If there were actual damages for fraud, then the jury should have set those out, based upon the charge that the Court gave.

"THE FOREMAN: Well, well intentioned and fairly intelligent jurors did not completely understand that, Your Honor.

"THE COURT: Is this your verdict in the case at this time or is it not?

"THE FOREMAN: Well, the way that you have rendered the verdict is not what we rendered, Your Honor.

"THE COURT: Well, then, I have a question as to whether or not at this point in time this is your verdict in the case. Is it your verdict in the case?

"THE FOREMAN: It would not be mine as it has been assessed.

"THE COURT: Does the jury want to resume deliberations and consider its verdict in the case if this is not the verdict at this time that it is being published in court?

"THE FOREMAN: I cannot support, as it has been published by Your Honor.

"THE COURT: I cannot accept a verdict at this time when at least one member of the jury and possibly others are stating that that is not the jury's verdict as to the fraud charge and fraud claim. If the jury wishes to return to the jury room, I will send to you the verdict and you can write out your own verdict in the case and the Court will receive that from you. . . . You can return to the jury room at this point."

The jury thereupon resumed its deliberations and amended its verdict to add to it an additional award of actual damages for fraud in the amount of $100. The appellants' primary contention in this appeal is that the trial court erred in allowing the jury to resume its deliberations and amend its verdict in this manner after the original verdict had been announced. *Held*:

1. Generally speaking, " '[t]he jury have the right and power to correct or change their verdict at any time before it has been finally recorded and they have been discharged.' " *Sears, Roebuck & Co. v. Chandler*, 152 Ga. App. 427, 432 (263 SE2d 171) (1979), citing 89 CJS 190, Trial, § 511. A trial court is accordingly empowered to allow the jurors to resume their deliberations for the purpose of amending and correcting an inconsistent or otherwise defective verdict. See *Colonial Stores v. Fishel*, 160 Ga. App. 739 (2) (288 SE2d 21) (1981).

Unfortunately, the trial court's attempt to exercise this power in the present case resulted in a verdict more defective than the original had been, in that the additional award of actual damages for fraud, which was clearly intended by the jury merely as a device to save the award of attorney fees, was duplicative of and thus incompatible with the original award of actual damages for breach of contract in the amount of $12,103.68, which was left intact. The only problem with the original verdict, on the other hand, was that the jury's award of $1 as punitive damages for fraud was inconsistent with its decision to predicate the award of actual damages on breach of contract. Punitive damages are, of course, not available for mere breach of contract; and, consequently, where a recovery is sought both for breach of contract and for fraud based on the same conduct, punitive damages may not be awarded unless the award of actual damages is predicated on fraud. See OCGA § 13-6-10; *Chrysler Corp. v. Marinari*, 177 Ga. App. 304 (1) (339 SE2d 343) (1985).

The trial court, of course, was of the opinion that the jury's original award of attorney fees in the amount of $5,000 was also inconsistent with its decision to award actual damages based on breach of contract rather than fraud. However, OCGA § 13-6-11 authorizes an award of attorney fees as expenses of litigation in a breach of contract action whenever the jury determines that "the defendant has acted in bad faith in making the contract, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." The term "bad faith," as used in this code section, clearly encompasses misconduct other than fraud. "[W]hile bad faith does not have reference to a simple refusal to pay a debt . . . or to the motive with which the defendant defends the action (Cit.), there may be bad faith in carrying out the provisions of the contract sufficient to support the award . . . provided it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive." *Jordan Bridge Co.*

*v. I. S. Bailey, Jr., Inc.*, 164 Ga. App. 124, 126 (296 SE2d 107) (1982). See also *Glen Restaurant v. West*, 173 Ga. App. 204, 205 (325 SE2d 781) (1984).

Although an examination of the court's charge in this case reveals the jurors were erroneously instructed to the contrary, it is clear from the above authorities that their authority to award attorney fees as expenses of litigation in this case was not contingent upon whether they awarded actual damages for fraud. Thus, the only portion of the original verdict which need have been stricken was the nominal award of punitive damages in the amount of $1. Since the jury's subsequent award of actual damages for fraud in the amount of $100 was clearly intended merely as a device to save the award of attorney fees and was, in any event, incompatible with the award of actual damages for breach of contract in the amount of $12,103.68, the judgment of the trial court is vacated with direction that a new judgment be entered based on the jury's original award, minus the $1. in punitive damages.

2. Because the jury obviously did not intend to award any actual damages for fraud until they were erroneously instructed by the court that they had to do so if they wished to save the award of attorney fees, and because the award of actual damages for fraud has now been vacated, the appellants' contentions respecting the court's recharge on the elements of fraud are now moot and need not be considered.

3. The evidence was sufficient both to support an award of damages for breach of contract and to support an award of attorney fees as expenses of litigation pursuant to OCGA § 13-6-11. Consequently, we hold that the trial court did not err in denying the appellant's motion for directed verdict with respect to either of these claims for any of the reasons set forth in this appeal. For the reasons stated in Division 2, supra, any error committed by the trial court in denying the motion for directed verdict with respect to the fraud claim is now moot.

*Judgment vacated and case remanded with direction. Birdsong, P. J., and Sognier, J., concur.*

DECIDED APRIL 24, 1986 —
REHEARING DENIED MAY 9, 1986.

*Peter F. Boyce*, for appellants.
*Samuel N. Werbin*, for appellee.